Good morning, your honors. May it please the court. My name is Timothy Graber. My name is Timothy Graber. I represent the appellants in this case. That is Dr. John Rapicci, his wife Lorraine, and their daughter Julie Stone in her capacity as the trustee of two life insurance trusts, irrevocable life insurance trust. This case, your honors, is about negligence and breach of fiduciary duty, and that those claims are in connection with the provision of financial services and wealth management services that were provided by Christopher Jarvis, the defendant. And this case today is before us because we're appealing from a decision in order from January 2020, which granted motions in part to dismiss the claim for failure to state a cause of action. And they did dismiss the negligence claims, but they kept the breach of fiduciary obligation claims alive. The case continued, your honor, and a couple years later, after some discovery, November of last year, they dismissed the summary judgment case. I'm sorry, the fiduciary duty claim. So that's how we got here. And I think it's important to talk about the parties first. Dr. Rapicci, when he first met Mr. Jarvis, was a 66-year-old, about 66 years old. And he contacted him. He was a very successful orthopedic surgeon. And he called him up, and this is description from the deposition testimony of Mr. Jarvis. He gets a phone call, Mr. Jarvis, that is, in his office out in California. And at this point, Mr. Jarvis is a principal in Jarvis and Mandel. Mr. Jarvis is a very, very smart man. He has a bachelor of science degree in applied mathematics. He has a master's of business administration degree. He has some experience with an insurance company working as an actual aerial scientist. So he has a lot of experience. And he describes the call as this, that Dr. Jarvis, I'm sorry, Dr. Rapicci introduces himself and says, I'm an idiot, or I'm a fool, or something to that effect. But he goes on to tell him, I saw you speak at a medical conference. And that was because at the same time he was a principal in Jarvis and Mandel, he had started a publishing company. And the publishing company published books about wealth management, and particularly books about wealth management for medical professionals. So there was a whole number, a great deal of books. And it's dealt with in the deposition testimony quite a bit. Council, and I appreciate your laying out the background here. I think we're all familiar with the background facts here. Could you go directly to the question on the statute of limitations, particularly one of the possible tolling doctrines, which is the notion that there was a continuing wrong here. Could you just articulate in your view what's the proper analysis on that? Well, the district court, Your Honor, said that it was just a question of damages. In other words, they said the conduct that we spoke of when we argued that that doctrine could apply, it only spoke to increases in damages. They pointed to the negligence as being the sale of the 026 policy. And they did not speak about any of the conduct thereafter, the failure to monitor the policy. Again, could you just articulate your analysis of why the failure to monitor here would be in particular, I guess, a continuing wrong, whether it's a breach of fiduciary duty or other ones? Because it wasn't just the sale of an insurance policy. I think that's where the court went wrong. The 026 policy, Your Honor, was just one component in what Mr. Jarvis had titled the CTS strategy. That was the strategy that he put together for Dr. Repicci and his family. And it was a very specific strategy about how he could maximize the wealth that he would leave for his family. So the insurance policy was just one part of it. And further, Your Honor, in a letter dated October 9th, the day before the policy was sold, this was a letter to High Polikoff, and that was my client, Dr. Repicci's accountant. He explained to him, I will monitor this policy, because they had questions, because both Dr. Repicci and I had information provided in the CTS plan about the 026 policy. And they had specific questions, Your Honor, because the illustrations didn't necessarily show that it was going to last until Dr. Repicci was at least 100 years of age. So in connection with that, he wrote them back. He assured them that that wasn't a problem. But he did say, we will monitor the policy every year. And if there's a problem, we can take corrective action. So that's where I think that the court went wrong. I think, Your Honor, there was an ongoing obligation to monitor the policy. Your complaint has, there are some junctures at which action, specific action associated with monitoring could have been taken and allegedly should have been taken. Namely, converting, switching to a guaranteed policy when that option was available. That's back to that three, four time range. Are there any allegations after that, that had Jarvis been properly monitoring, there are actions he could have taken to avoid the loss that the client suffered? Yes, Your Honor. In the complaint that was originally filed in New York State Supreme Court and then moved to Federal District Court, there are allegations about the promises in the general facts section, all of which are in reference to the causes of action, that we think the court overlooked. And those allegations were that Mr. Jarvis did more than sell them an insurance policy. He sold them. I think I see where you're going, but I want to be very focused here, not on promises. Let's assume that we accept the premise that there were promises to continue to do things all along. Are there allegations of causation and damages relative to any of the breaches of those promises following, say, 2006? Yes, Your Honor. There are allegations that if he failed to monitor the policy, and had he monitored the policy and saw that it was in difficulty, and he could have taken corrective action, whether it be transfer it to another company. He talked about internal transfers in some of the correspondence. There's testimony and written documentation of discussion about changing it to another company. But he admitted at his deposition he didn't monitor any of this. So the damage associated with the failure to ongoing monitoring is that there were things he could have done if he had jumped in sooner than 2014? Yes, Your Honor, we believe so. And that's difficult to say because he didn't do it. So it's a difficult argument to make because you'd have to point to the year and what the options were at that point in time. Could you point us to a specific allegation, and I mean specific page in the record, where there is such an allegation as to something Jarvis could have done within the limitations period? In other words, let's hypothetically say he had promised, we agree that he promised to monitor this every year, right? And he could have done something through 2010. But then after that, it was hopeless, right? That wouldn't bring you within the statute of limitations. But you would have to allege a continuing wrong that brings you within the statute, right? That's correct, Your Honor. And that period is whatever date in 2014? Yes, Your Honor, 2014. So could you tell us a specific allegation somewhere, like by paragraph or page number, where you're alleging something he could have done as late as some period within the limitations period? Your Honor, by letter dated March 5th, 2014, and it is in the record, the joint appendix at page 602. Yes, that is an effort by Mr. Jarvis to correct the problem. He acknowledges there's a problem, and he does outline some things that he thinks could be done in order to try to salvage the policy, things that could be done before it lapses. But that's not a failure to monitor. That's actually doing what he's supposed to do. That letter, Your Honor, that's true, Your Honor, but that letter was in response to my client's letter dated January 7th. He said to him, the IRS has all kinds of questions about these two insurance policies, not only the 026, but the mass mutual policy. And he reached out to him for help. And he said, we need information. And then he looked at it. And in that same correspondence, it's the first time he ever said to him, in writing, with record, in the record, that this is not a guaranteed policy. But there seems to be a disconnect, right? Because there must be a continuing wrong, right? So something bad that happened within the limitations period that could have caused damages, right? So if you're saying here he is monitoring, and there is something that could have been done, and he's properly monitoring it, like he starts fulfilling his duties again, that's not a wrong, right? That's where he stops doing the wrong. Unless you're saying that this somehow reflects back to, well, I don't know what you're saying here. Well, the wrong could be, Your Honor, our argument is this, that one or more, there's at least a question of fact with regard to whether one or more of the tolling doctrines apply. But if you look at it. Okay, let me just be clear. I'm probably not being clear with my question. The letter that Jarvis sends on page 602, how is it part of a wrong? What about this constitutes part of a wrong? Well, at that point, he admits, number one, that it wasn't a guaranteed policy, something he didn't disclose earlier, which goes to the negligence omission. No, but that's evidence of something he did wrong in the past. What is it that he did here that's tortious? Well, also to. As opposed to evidence that in the past something he did was tortious. Well, it shows that the client is damaged in the sense that he's saying you have to pay more money. And again, you say it shows that he was damaged. I'm saying what is it here that's tortious? What's wrong? What is it here he's doing in this letter by virtue of the letter that is, if you're saying it's a continuous wrong, what is wrong? What did he do wrong here? If I understand your question correctly, Your Honor, by virtue of the letter, there's nothing wrong. That's what he should have been doing every year. He should have been looking at the policy. That's the problem. My problem is that you're pointing us to a effort to monitor as opposed to a failure of monitoring. There might be some other issue, some other wrong, but it is not a wrong associated with the failure to monitor as alleged in the complaint. He said despite his express representations that he would monitor this 33, any plans that he instituted. But then you're pointing us to a letter that says I'm monitoring, and your client might appreciate the argument, but your client was not happy with the monitoring. There might be some other wrong. Maybe we should move to that. Well, he admitted during his deposition, Your Honor, that he did not monitor the policy. And the letter I pointed to was just, to me, it tells the reader that he understood that he should have been monitoring it. If he had no ongoing obligation to do it, why did he do it when he got the letter from my client? This goes back to Judge Robinson's question. At what point was the failure to monitor too late, right? Is the notion that failure to monitor each of the first five years, it would have caught something that was fixable. But at a certain point, I get the sense that by this moment, I thought your view is it's too late. I mean, yeah, he should have been monitoring. He's monitoring now. But it's too late to fix the thing. The harm has been achieved. It's not getting worse. It's already baked in. Because he doesn't want to follow, I thought, he didn't want to follow Mr. Jarvis's recommendation in 602, right? Well, Your Honor, it's hard to say at what point would the policy have been salvageable through corrective action. We don't know that, again, because he didn't monitor it. But I think that this letter says that despite his testimony that he didn't do it, he realized he had to do it. Because, you know, it goes back to the letter that he wrote in November 9, 2002, where he said he would do it. He said he would do it every year. And he didn't. Now, it is on the other side. You represent Jarvis? Yes, for Matthew Tracy. And if it pleases the court, my name is Matthew Tracy, and I represent Christopher Jarvis. And I just wanted to follow up with your questioning of plaintiff's counsel. And I think in terms of the wrong that's being alleged in the discreet, that what the plaintiff is alleging is that you sold me a non-guaranteed insurance policy when I wanted a guaranteed insurance policy. And everything that happens in 2002 and everything thereafter stems from that. And no amount of monitoring, as Judge Scretany put in his opinion, and I think it's correct, is going to change that fact. Well, there would have been an opportunity to potentially switch companies, exchange for another policy, salvage some value, at least for some period of time, maybe not into the limitations period. That is correct, Your Honor. That would have been through approximately 2005. The deposition testimony was that Mr. Jarvis was under the impression that he was going to be able to switch within Lincoln, but then Lincoln stopped offering that in 2005. And so at that point, was probably, at least based on the evidence that we have on the record, was the last opportunity for that. Can I shift the focus from the continuing wrong-tolling theory to the continuous representation? Certainly. So we had in 2002 the representation that don't worry, problems aren't going to sneak up on us because we're going to see what happens every year. John Lorraine and I will know every year what their policy is being credited. If we see two or three bad years in a row, then we will address the problem immediately so no major problem rises. That certainly sounds like an indication that it's an ongoing process, that this isn't a one and done. And then you look forward, and every year or so for the next few years, there's a fair amount of communication about this particular policy. Then going forward, there's ongoing communication about the wealth management more broadly and the use of new policies and additional policies. And there's correspondence about, well, is this not the 026, but the other Lincoln policy? Should we make some changes to this? I realize there's a gap, but why isn't this a continuous course of wealth management representation such that the continuous representation total applies? Because they stopped. I mean, they stopped for years. There is no discussion of the 026 policy from 2004 to 2014. There's none. The only discussions during that time period after 2004 deal with the second policy, which my client didn't sell and plaintiffs had withdrawn their claim with it. The stopping is interesting because I can see how it could play both ways, right? I understand the theory is that's indicative of the fact that any continuity in the representation had ended. I don't see anything in the record from the Jarvis saying, by the way, I'm not monitoring anymore. The continuous representation has ended. So you could also see that that lack of communication is just indicative of the very breach that's the subject of the case, and there's not really been anything that formally terminates the responsibility to continue monitoring. But that breach happens far earlier, well before January of 2014. That breach- Well, if the breach was not only the, well, first of all, it's continuous representation rather than continuous wrongs. Then we're not sort of playing that game of what's the moment at which it could have gone better. We're asking the question whether the representation continued into the limitations period, which certainly, based on the communications in the 2014 and 2015 time period, you could see an argument that that's a manifestation of the continuing representation. And that's really what I'm trying to explore. Oh, for continuous representation, just a few salient facts, and getting to your question, Your Honor, is there were no communications whatsoever between Mr. Jarvis and the pointers from 2007 through 2011 about any topic. And so in your view, that's evidence- That's not continuous. Well, so if I'm, let's say I'm your lawyer, and I'm monitoring your estate plan. And I say, I'm going to keep an eye on your estate plan, and I'm going to let you know if there are any changes that create problems. And then I don't talk to you for five years. Is the inference that the representation has ended, or is the inference that I haven't seen any problems? In this instance, I believe it's ended. And the reason is a couple, is that he is, he, the pointers are receiving annual statements from Lincoln listing Mr. Mandel, who was at the time Mr. Jarvis' partner, as the broker of record. So at that point, the pointers would be on notice that Mr. Jarvis is not servicing that particular product. And that would also at least raise a question, you know, from my perspective, that the continuous representation is not going on. That there is a break in the chain, if you will. With respect to the March 2014 letter, that is now within the three years, but that is not a wrong as- No, it doesn't have to be a wrong, right? On the continuous representation, we're not asking whether it's a wrong. We're asking whether it's evidence of the ongoing continuity, or whether it's the beginning of a new relationship around this. And I think by focusing on the product, that's one way of looking at it. But focusing on the overall planning, I think, is the- Well, I think it's overstating it to say it's an overall planning, is that basically what was going to occur with respect to this policy is that you would have- You would sell two policies, you'd put them in a profit sharing plan, then you would- Eventually they would go to your children. It's just that the instrument of that are two insurance policies. That's it. So you don't have- You're not in any sense charging a wealth management fee. You're not doing anything other than selling two insurance policies. And for that reason, we've argued in our brief that he's not even a fiduciary. And there are cases where the continuous representation doctrine doesn't apply to insurance brokers for this reason. So how do we- I think the fact that's the hardest for you, and there's gaps, there's good facts, but the bad fact is what looks an awful lot like a promise that this is an ongoing relationship for the life of the policy. And I'm wondering how you fit that into your framework of analysis. How I fit that is, again, I would follow what Judge Scratley said, is that at the end of the day, nothing that- If you'd monitored it forever, nothing that Mr. Jarvis could do could convert a non-guaranteed policy into a guaranteed policy. Oh, no, I understand, but for the continuous representation theory. We're not looking for whether something would have changed. We're looking for whether there's an ongoing relationship. For the ongoing relationship, I would assert two things, is that there was no discussion whatsoever for a 10-year period about this policy. From 2004 to 2014, there is absolutely nothing in the record that this was discussed between the plaintiff. That's a very, very long time, especially when the plaintiff is getting account statements every year showing that it's a shorter time than age 100, that it's going to age out. This is not a particularly arcane piece of insurance. What you're trying to do is, is it going to run out by age 100, or is it going to be a little earlier? And that kind of depends on interest rates, and that's kind of why we're here, is that interest rates went down to zero from approximately 2008 through about this time period. Can I ask about your characterization of the record? Because in Jarvis' deposition at 620 in the appendix, he talks about, through the years, I talked to him about the different options. You can pay a lump sum, you can pay a number of different ways to give yourself guarantees in these products. And I actually did that for both the 026 and the 144 policies, and I gave him options. I think all the way back to maybe 2007, or somewhere well before 2014. He's emphasizing that 2014 wasn't the first time he'd given these options. He's clearly testifying that these conversations didn't just spring up in 2014 for the first time, that he'd been giving that information through the years. Am I misreading the record? No, you're not misreading that, but what it's referring to, and I was there, is that he's referring more to the 144 policy. But he says, and I actually did that for both the 026 and the 144 policies. And again, it's always difficult, but I think he's referring to the 2014 recommendation he made for the 26 policy and then the 2011 recommendation. Except for that you finished the sentence. It says I actually did that for both the 026 and 144 policies and gave him options, I think, all the way back to 2007 or somewhere well before 2014. So if what you're saying is that he's thinking about, in other words, we don't have to decide what the facts are. We have to figure out whether there's a disputed fact. And I'm just trying to understand, you've made the representation that the record is undisputed, that there was no communication regarding this policy for a long period of time, and that seems to over a very long time period. That's why we have statute of limitations. I mean, he's trying to remember the written, the document, and I just worked off the documents. So we shouldn't separately credit the testimony unless we can find documentary corroboration. Yes, I would say that. Okay. Thank you very much. And thank you. We'll hear from counsel for OJM Group. Good morning, your honors. May it please the court, Jeremy Margolin for defendant OJM Group, LLC. The district court granted OJM's motion for judgment on the pleadings dismissing plaintiff's claims against my client, and that decision should be affirmed. You know, OJM is really an afterthought in this case. I think that's clear in the complaint. That's clear in the briefing. It's clear in the briefing. OJM is an afterthought here. It's clear in argument. Would you mind just tilting up the microphone just so we can make sure? Certainly. Is that better? Yes. Thank you. And it's clear from argument today. You know, it's undisputed that plaintiff's claims against my client are entirely premised on vicarious liability. So if the court finds for Mr. Jarvis, then it necessarily must also find for OJM. But I want to address a few points that were made already this morning that apply with particular salience to OJM, right? We were talking about some of the questioning from the court focused on the continuing wrong doctrine. And the question is whether there are continuing wrongs within the limitations period. Well, that question couldn't be more, the answer to that question couldn't be more clear from OJM's perspective because it's uncontroverted that OJM and Mr. Jarvis parted ways in 2011. So it's really logically impossible. So even, you know, again, Mr. Graber hasn't identified, I think, any continuing wrongs as the court, I think, alluded to. But even if he could, right, none of those would fall within the period of time, could not simultaneously fall within the limitations period and within the time period that Mr. Jarvis was affiliated with OJM. But I'm not understanding. If Mr. Jarvis was your agent for 10 or 12 years to fall within the statute of limitations, and let's assume hypothetically we decided that was correct, would OJM then be off the hook for the 10 years of now told wrongs that it wouldn't be on the hook for those courts? I don't understand that. Maybe you'd be off the hook for the last two years or something. Well, I think as your Honor pointed out, the plaintiff has to, plaintiffs have to identify a continuing wrong that occurred within, from 2014, between 2014 and the filing of the complaint, the three-year sort of limitations window. But my client was no longer involved. Mr. Jarvis and my client parted ways in 2011. So again, because this is entirely premised on vicarious liability, any wrong that plaintiffs could identify within the limitations window would be, would post-date OJM's involvement. So it's not told as to you. It could be told as to Jarvis. And there could be a situation where it's told as to Jarvis and not told as to you. That's your argument. Exactly, Your Honor. And the point is that this issue of continuing wrongs and the failure to identify continuing wrongs within the limitations period actually is a logical impossibility with respect to my client. That's our argument. And I think the same thing goes with respect to the continuous representation that we were discussing, that you were discussing earlier, which is the question was, can we identify a specific point in time, a threshold after which the representation was terminated? Well, with respect to OJM, there's no question that that can be identified with certainty because 2011, Mr. Jarvis and my client parted ways. The other thing I wanted to point out, just be very clear, all the discussion to date, today, this morning, and really in the briefing, was about the 2002 policy. But the plaintiffs never asserted any claims against OJM with respect to the 2002 policy. And in fact, after we were dismissed out of the case, they abandoned or voluntarily withdrew their claims about the 06 policy. So really we're in a sort of interesting position here. If we're to be held vicariously liable, that's really, again, impossible because it's been admitted that Mr. Jarvis was not the salesman of record for the 06 policy, which is the entire reason that the 2006 policy is not involved here. The abandonment of these claims is really clear from the briefing and from argument today. I'll say one other thing about the timeline. Again, this is why some of these arguments apply with particular salience to OJM, which is that OJM didn't exist in 2006 when plaintiffs bought the policy that is the subject of the claims against OJM. And that fact isn't in dispute. So the negligence of these claims, which are the only claims asserted against OJM, really involved Mr. Jarvis' conduct at the time, which was 06, the sale, and none of the allegations that are the subject of those claims occurred after that time. And plaintiffs don't make any allegation or even a point at. I think that's it. Thank you. Just briefly, Your Honor, I appreciate the Court pointing to the record where the testimony was that Mr. Jarvis did communicate with my client as late as 2012 about the 026 policy. He clearly said that, and at the time he said the 144 as well. So there is testimony to that effect. My client was never made aware of any change in agent or change in broker form. I don't believe there's anything in the record as far as that goes. And otherwise, again, I started to talk about it earlier. So with respect to the continuous representation doctrine under New York law, does it apply to insurance brokers? Continuous representation, at least by the common law, Your Honor. Well, it can, Your Honor. There's case law in New York where they say if the insurance broker, if that's all that he was, and we take issue with that, but if it was an insurance agent or broker. But this is an insurance policy, so I take it that in the context of at least this case, we shouldn't regard Jarvis as an insurance broker. Respectfully, Your Honor, I disagree. He sold a wealth management plan. He sold a sophisticated plan generally referred to in the industry as a pension plan where you get, you know, he took $4 million from an IRA, directed my client to move it to a profit sharing plan. The 2-6 policy is called what? Not a policy, but a plan? Your Honor, it's an insurance plan, but it was a component in a pension rescue plan. It was one component of the services that Mr. Jarvis provided to my client. That's where I take issue. I'm not saying it wasn't an insurance policy. He would just return back to the initial question. But, Your Honor, even if it was just an arm's length transaction with the sale of an insurance policy, if there is a special relationship between the two and there's questions about the application of the policy in Murphy, a court of appeals case in New York, it's case by case basis, but you can find a fiduciary obligation of an insurance agent that would allow for the application of the continuous representation doctrine. Did you make this argument, the breach of fiduciary duty argument in front of Justice Scruttony, specifically? I'm sorry, Your Honor, did I personally? Well, no. Counsel, below. Yes, Your Honor. They certainly opposed the motion. When you say this argument, they had moved for summary judgment to move to dismiss the breach of fiduciary duty obligation. But, in general, Your Honor, I don't know if you mean the specific argument that I'm articulating now. The specific argument that you're making now. I believe it was in the court below as well. Your Honor. Thank you very much. Thank you.